AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

JAVID ESTEVEZ and MARIBEL QUINTERO,

Defendant

Case No.    2:22-mj-04529-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about October 19, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

|  Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Adam Cirillo*
*Complainant's signature*

Adam Cirillo, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      11/16/22                      _____
*Judge's signature*

City and state:   Los Angeles, California        Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Amanda Elbogen (x5748)

**AFFIDAVIT**

I, Adam J. Cirillo, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Javid ESTEVEZ ("ESTEVEZ") and Maribel QUINTERO ("QUINTERO") for a violation of 21 U.S.C. § 846:  Conspiracy to Possess with Intent to Distribute a Controlled Substance.

2.    This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE") in the custody of the DEA in Los Angeles, California, as described more fully in Attachment A: a blue OnePlus cellphone with IMSI 310260665114373 and International Mobile Equipment Identity ("IMEI") 862812061100256 (the "SUBJECT DEVICE"), as described more fully in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrant, and does not purport to set forth all of my
knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the United States
Department of Justice, Drug Enforcement Administration
("DEA").  I am currently assigned to the Los Angeles Field
Division.

6.    I have worked for the DEA as a Special Agent since
December 2019.  Prior to becoming a DEA Special Agent, I was a
sworn law enforcement officer with the Cobb County Police
Department in the state of Georgia.  As such, I was tasked with
conducting law enforcement operations, including those involving
narcotics.  Cumulatively, I have approximately five years of
sworn law enforcement experience.

7.    I have received training and have experience
investigating violations of both state and federal narcotics and
money laundering laws, including but not limited to 21 U.S.C.
§§ 841, 846, 952, 959, and 963, and 18 U.S.C. § 1956(a).  I have
been involved in electronic surveillance methods, the debriefing
of defendants, informants, and witnesses, as well as others who
have knowledge of the manufacturing, distribution,
transportation, and storage of controlled substances and the
laundering of drug proceeds.  Prior to becoming a DEA Special

Agent, I attended a 17-week Basic Agent Academy at the DEA
Training Academy in Quantico, Virginia. I also attended a 23-
week police academy in Cobb County, Georgia.  Over the course of
my career, I have received both formal and informal training
regarding money laundering, drug trafficking and distribution,
and other applicable criminal law.

8.    Throughout my law enforcement career, I have
investigated individuals and criminal organizations that have
represented a significant threat to public
safety.  Specifically, during the course of my employment, I
have received comprehensive, formalized instruction on
identifying narcotics, money laundering techniques, patterns of
drug trafficking, complex conspiracies.  I have also been
trained on narcotics traffickers' use of telecommunications
devices, criminal law, surveillance, and other investigative
techniques.  I have participated in investigations involving
unlawful possession with intent to distribute, distribution of
narcotics and controlled substances, laundering of narcotics
proceeds, trafficking of controlled substances and precursor
chemicals, and conspiracies associated with the aforementioned
offenses.

9.    I have participated in many aspects of drug
investigations.  I am familiar with narcotics traffickers'
methods of operation, including the manufacturing, storage,
transportation, and distribution of narcotics, the collection of
money that represents the proceeds of narcotics trafficking, and
money laundering.  I am also familiar with the manner in which

3

narcotics traffickers transport and distribute narcotics in areas they control.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10. On November 8, 2022, Javid ESTEVEZ used the SUBJECT DEVICE to call a person he believed was a drug customer, but who was in fact a Confidential Source working for the DEA (the "CS"),[1] and told the CS that he recently purchased 65 pounds of methamphetamine and that he has 25 pounds remaining. ESTEVEZ offered to sell the 25 pounds of methamphetamine to the CS for $750 per pound, and told the CS he would provide a sample of the methamphetamine.

11. On November 9, 2022, the CS and ESTEVEZ exchanged text messages in Spanish discussing the amount of methamphetamine that ESTEVEZ would sell to the CS. A short time later, ESTEVEZ, using the SUBJECT DEVICE and via a video call, ESTEVEZ showed the CS a bag of the methamphetamine. ESTEVEZ agreed to meet the CS to sell the CS approximately 40 pounds of methamphetamine.

12. On November 14, 2022, ESTEVEZ met with the CS over the course of two meetings. During the first meeting, ESTEVEZ sold the CS approximately 4 pounds of methamphetamine for $750 per pound. During the second meeting, ESTEVEZ brought an additional

---

[1] The CS began working for DEA in 2021. In or around September 2021, the CS was arrested for possession of methamphetamine. The CS is currently providing information to investigators for monetary compensation. The CS has provided truthful information to investigators which has been independently corroborated. The CS has previously provided information to the DEA in another investigation that has been corroborated and proven to be reliable, and has not provided any information that was later determined to be false or otherwise unreliable.

approximate 14 pounds of methamphetamine to the CS.  ESTEVEZ was subsequently arrested.  Agents found then SUBJECT DEVICE in his car.  After the SUBJECT DEVICE was seized, I called the telephone number ESTEVEZ had used with the CS, and saw that the SUBJECT DEVICE rang.

13.  As ESTEVEZ was being placed under arrest, a woman later identified as Maribel QUINTERO approached the arresting agents and began interfering with the arrest and ignoring commands to remain at a distance.  She stated that she knew ESTEVEZ.  The agents attempted to detain QUINTERO to further the investigation, but QUINTERO again resisted and ignored agents' commands.  The agents arrested QUINTERO and Mirandized her.  QUINTERO agreed to speak with the agents and acknowledged that she was involved in small drug deals with ESTEVEZ.  She volunteered to allow the agents to look at her phone.  Her consent to the search of her phone was audio recorded.

14.  From a search of QUINTERO's cellphone, agents discovered that earlier that day, on November 14, 2022, at approximately 5:41 pm, ESTEVEZ texted QUINTERO: "hope your not talking and saying 750."  As noted above, ESTEVEZ had previously agreed to sell the CS methamphetamine for $750 per pound.  At approximately 6:50 pm – around the same time ESTEVEZ had told the CS he was still waiting for the drugs – ESTEVEZ texted QUINTERO an address of 5506 S Figueroa and told her to wait on the corner.  QUINTERO responded at 6:53 pm indicating that she was in the 7-Eleven near that corner.  GPS location data from the SUBJECT DEVICE, obtained pursuant to a federal search

warrant, showed that at approximately 6:49 pm, the SUBJECT
DEVICE was in the vicinity of South Los Angeles, California and
within 2.6 miles of 5506 S Figueroa Street.

## IV. STATEMENT OF PROBABLE CAUSE

15.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

16.  According to the CS, on November 8, 2022, ESTEVEZ
called the CS.  During the call, ESTEVEZ told the CS that he
recently purchased 65 pounds of methamphetamine and that he has
25 pounds remaining.  ESTEVEZ offered to sell 25 pounds of
methamphetamine to the CS for $750 per pound, and told the CS he
would provide a sample of the methamphetamine.

17.  On November 9, 2022, the CS and ESTEVEZ, using the
SUBJECT DEVICE, exchanged text messages in Spanish discussing
the amount of methamphetamine that ESTEVEZ would sell to the CS.
I have reviewed the text messages.  The CS asked ESTEVEZ how
many "crystal balls," referring to methamphetamine, he could
give to the CS, and ESTEVEZ, using the SUBJECT DEVICE, responded
"8," referring to eight pounds.  The CS asked ESTEVEZ to get as
much as he can and that he/she would pay for it.

18.  A short time later, ESTEVEZ, using the SUBJECT DEVICE
and via a video call, showed the CS a bag of the
methamphetamine.  Due to this method of communication, the call
was not recorded, however, the CS was able to take a screen-shot

during the video call, which showed ESTEVEZ and the bag of methamphetamine.

19.  On November 11, 2022, ESTEVEZ and the CS, in a recorded call, planned a series of drug transactions and scheduled them for November 14, 2022.  ESTEVEZ offered to sell the CS five pounds of methamphetamine on November 14, 2022.  The CS told ESTEVEZ that if the CS liked the quality of the five pounds purchased, the CS wanted to purchase at least 40 additional pounds of methamphetamine later that same day.  ESTEVEZ confirmed that was possible.  Later in the conversation, ESTEVEZ and the CS agreed for the CS to purchase approximately 4 pounds of methamphetamine initially instead of 5 pounds.

20.  On November 14, 2022, at approximately 11:44 am, the CS and ESTEVEZ communicated on a recorded call.  ESTEVEZ asked the CS what time the CS was going to come to ESTEVEZ's house to pick up the "4", referring to 4 pounds of methamphetamine.

21.  At approximately 11:45 am, ESTEVEZ texted the CS an address of 515 S. Stewart Dr, Covina, California which agents confirmed is an address associated with ESTEVEZ per the subscriber information of the SUBJECT DEVICE.  The text message was recorded.

22.  At approximately 12:45 pm, agents met with the CS at a pre-determined location and searched the CS and did not locate any contraband.  DEA agents provided the CS with an undercover vehicle (the "UC vehicle"), which the agents searched prior to giving it to the CS to confirm it did not locate any contraband.  DEA agents also provided the CS with an audio recording device

and $3,000 in cash that the CS was directed to use to purchase the 4 pounds of methamphetamine.

23.    At approximately 1:10 pm, agents established surveillance at the Home Depot located at 963 W. Badillo St, Covina, California.  Once agents were ready for the operation to occur, agents instructed the CS to inform ESTEVEZ of the location.  I was present for the surveillance and had visual of the UC vehicle, the CS, and the Mercedes driven by ESTEVEZ that later arrived to meet with the CS.

24.    At approximately 1:14 pm, the CS parked the UC vehicle in a pre-arranged parking spot within the Home Depot parking lot.  Agents followed the CS from the neutral location to the Home Depot.

25.    At approximately 1:23 pm, the CS spoke with ESTEVEZ on a recorded call.  The CS asked ESTEVEZ if he was going to bring 4 (referring to 4 pounds of methamphetamine).  ESTEVEZ said that he was going to bring one and then the CS would give ESTEVEZ the money for the other 3, after which he would return with the remainder of the drugs.  The CS informed ESTEVEZ that they already agreed on 4 and that the CS wanted 4 pounds (referring to the methamphetamine).  ESTEVEZ tried again to get the CS to come to ESTEVEZ's house, however the CS told ESTEVEZ to come to the Home Depot and ESTEVEZ agreed.  I listened to the recording later with the CS, as he translated it into English.

26.    At approximately 1:34 pm, the CS spoke again to ESTEVEZ on a recorded line.  The CS provided ESTEVEZ with the

location of where the CS was parked within the Home Depot
parking lot.

27.  At approximately 1:36 pm, I observed that the CS
exited the driver seat of the UC vehicle and was standing
outside the vehicle near the driver side rear/trunk area.

28.  At approximately 1:41 pm, on a recorded phone call,
ESTEVEZ asked the CS where he/she was parked in the Home Depot
parking lot.  The CS then asked ESTEVEZ what kind of car ESTEVEZ
was driving, and ESTEVEZ responded that he was driving a
Mercedes.

29.  At approximately 1:42 pm, agents observed a silver
Mercedes sedan with California license plate 6AAK458 travel
through the parking lot of the Home Depot.  Agents then observed
the Mercedes back into a parking space located directly next to
the UC vehicle and the CS.  From DMV database checks, the
Mercedes (hereinafter "Mercedes") was found to be registered to
Javid ESTEVEZ.  Agents observed that once the Mercedes came to a
complete stop, the CS entered into the front passenger seat of
the Mercedes.  Agents observed that the driver never exited the
vehicle.  Agents then observed that ESTEVEZ placed a sunshade
across the front mirror of the Mercedes and agents subsequently
lost visual of the interactions that were occurring inside.

30.  Agents obtained a CA DMV license photo of ESTEVEZ that
I viewed.  This photograph was shown to the CS prior to the
meeting, and after the meeting the CS confirmed that the person
he met with matched the photograph, and was ESTEVEZ.  At

approximately 1:47 pm, I observed the Target Vehicle depart the parking space and leave the Home Depot parking lot.

31. According to the DEA Agents at the scene, at approximately 1:50 pm, DEA agents followed the CS back to a neutral location, where they searched the CS and the UC vehicle. Agents seized four clear vacuum-sealed bags that contained a crystal-like substance suspected to be methamphetamine.  The bags were later weighed and weighed approximately 2 kilograms.

32. At approximately 2:18 pm, ESTEVEZ spoke to the CS on a recorded line and asked the CS to meet at ESTEVEZ's house. ESTEVEZ told the CS that ESTEVEZ was going to give the CS "15 and 15," referring to 15 pounds of methamphetamine.  ESTEVEZ told the CS to give him 45 minutes and stated that he was going to go pick it up.

33. At approximately 3:17 pm, the CS and ESTEVEZ had another phone call that was recorded.  ESTEVEZ told the CS he was going to get the "things".

34. At approximately 4:34 pm, the CS and ESTEVEZ spoke again on a recorded call.  ESTEVEZ told the CS to come to Montebello because ESTEVEZ was going there to get the "stuff". The CS responded "ok."

35. At approximately 4:50 pm, on a recorded call, ESTEVEZ told the CS that ESTEVEZ was going to pick up "13," referring to 13 pounds of methamphetamine, and that he had the other 2 pounds with him.  After he provided the first 15 pounds, ESTEVEZ said, he would bring the CS another 15.

36.   At approximately 6:05 pm, the CS and ESTEVEZ spoke on a recorded call.   ESTEVEZ said he was going to be in Commerce but could meet at 8:00 pm, because ESTEVEZ still had to wait for the individual bringing him the drugs.   He told the CS that the person who had the drugs was not home, but not to worry, that they would bring them to the CS where s/he was at 8.

37.   At approximately 8:14 pm, the CS spoke with ESTEVEZ on a recorded call.   ESTEVEZ stated, using coded language, that he had 15 pounds of methamphetamine and that he was about 20 minutes away.

38.   At approximately 8:25 pm, the CS texted ESTEVEZ the location of where to meet: a Superior Grocers located at 9100 Whittier Blvd, Pico Rivera, CA.   Shortly thereafter, the CS, who was still driving the UC vehicle, parked in a predetermined parking space in the parking lot of the Superior Grocers.

39.   At approximately 8:59 pm, I and other law enforcement officers conducting surveillance saw the Mercedes driving through the parking lot of the Superior Grocers and back into the parking space located directly next to the UC vehicle.   I then observed the CS exit the driver seat of the UC vehicle and go stand outside the front passenger window of the Mercedes and began to converse with ESTEVEZ, who was sitting in the driver seat of the Mercedes.   The CS was equipped with an audio recording device that I was monitoring.   From the recording device, I heard counting, which appeared to be ESTEVEZ counting the individual packages of vacuum sealed methamphetamine.   The

CS then gave a pre-determined signal, and DEA agents moved in to apprehend ESTEVEZ.

40.  I parked the front bumper of my vehicle directly in front of the front bumper of the Mercedes.  I was also utilizing my vehicle's emergency lights and I was clearly marked in Police insignia.  Upon parking in front of the Mercedes, I confirmed that the driver was ESTEVEZ.  I also observed ESTEVEZ throw two weighed plastic bags out of front passenger seat window of the Mercedes.  Additional agents who were plainly identified in Police insignia began to give verbal commands to ESTEVEZ. Agents observed that ESTEVEZ was not listening to their verbal commands.  ESTEVEZ exited the Mercedes, continued to lower his hands, and began to shuffle his feet and walk away from the agents.  ESTEVEZ continued to disregard the agents' commands. ESTEVEZ then began to run away from agents in an active attempt to flee the officers.  After a foot pursuit, ESTEVEZ was placed into custody near the Chipotle located at 8888 Whittier Blvd, Pico Rivera, CA.

41.  Agents subsequently found the SUBJECT DEVICE in ESTEVEZ'S car.  After the SUBJECT DEVICE was seized, I called the telephone number ESTEVEZ had used with the CS, and saw that the SUBJECT DEVICE rang.

42.  While in the process of arresting ESTEVEZ (after a brief foot pursuit), agents were approached by a female who was later identified as QUINTERO.  I learned from the agents at the scene that they initially believed QUINTERO to be an onlooker/bystander from the nearby Chipotle.  An agent then

stuck an arm out to stop QUINTERO from approaching the agents any further, as they were still in the process of placing ESTEVEZ into custody.  QUINTERO immediately began questioning the agents, asking what was going on, and what did ESTEVEZ do.  The agents told QUINTERO that she could not proceed any further to where ESTEVEZ was being detained.  QUINTERO did not comply with such commands and continued to move past the agents and actively interfere with the apprehension of ESTEVEZ.

43.  While QUINTERO was approaching agents, QUINTERO stated that she knew ESTEVEZ.  Upon hearing that QUINTERO knew ESTEVEZ, agents attempted to detain QUINTERO to further their investigation.  QUINTERO resisted agents by moving her hands and not following agents' verbal commands.  QUINTERO was detained and Mirandized, and she agreed to speak with agents.  QUINTERO informed agents that she knew ESTEVEZ was involved in drug deals but didn't know the deals involved in large amounts.  She admitted that a couple of days ago, ESTEVEZ contacted her and indicated he would help her with some small deals.  QUINTERO told the agents that she never helped with ESTEVEZ or any narcotic transaction.

44.  The arresting agents relayed information to me that they found an Apple iPhone with a Louis Vitton case on the person of QUINTERO.  Per the audio recording of law enforcement's encounter with QUINTERO, which I have reviewed, QUINTERO gave her consent for the agents to search the phone.

45.  From a search of QUINTERO's cellphone, agents located various pictures of narcotics such as a digital scale with

suspected methamphetamine being weighed for approximately 418 grams.  Agents also located text messages between QUINTERO and an individual saved in her contacts as Sparky in which QUINTERO wrote about the color, quality, and origin of one pound of methamphetamine.

46.  Agents also located on QUINTERO's phone text messages from earlier on November 14, 2022, at approximately 5:41 pm, between QUINTERO and ESTEVEZ.  ESTEVEZ texted: "hope your not talking and saying 750."  As noted above, ESTEVEZ had previously agreed to sell the CS methamphetamine for $750 per pound.  At approximately 6:50 pm, ESTEVEZ texted QUINTERO an address of 5506 S Figueroa and told her to wait in the corner.  QUINTERO responded at 6:53 pm indicating that she was in the 7-Eleven near that corner.  GPS location data from the SUBJECT DEVICE, obtained pursuant to a federal search warrant, showed that at approximately 6:49 pm, the SUBJECT DEVICE was in the vicinity of South Los Angeles, CA and within 2.6 miles of 5506 S Figueroa Street.  Based on the foregoing facts, I believe QUINTERO was working with ESTEVEZ to distribute methamphetamine.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

47.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

           b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their cell phones and other digital devices.

           c.   Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

           d.   Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices.  Drug traffickers often keep records of
meetings with associates, customers, and suppliers on their

15

digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

48.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

50.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel

may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

      b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

   51.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked

for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

        c.    The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress ESTEVEZ's thumb- and/or fingers on the
device(s); and (2) hold the device in front of ESTEVEZ's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

    52.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII.  <u>CONCLUSION</u>

    1.  For all of the reasons described above, there is
probable cause to believe that ESTEVEZ and QUINTERO have
committed a violation of 21 U.S.C. § 846:  Conspiracy to Possess
with Intent to Distribute a Controlled Substance.  There is also
probable cause that the items to be seized described in
Attachment B will be found in a search of the SUBJECT DEVICE
described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __16th__ day of
__November__ , 2022.


_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE